WEEHAWKEN DRY DOCK CO. v. CITY OF NEW YORK et al.

(District Court, S. D. New York. December 4, 1913.)

COLLISION (§115*)—LIABILITY—CONTRACT WITH CITY FOR USE OF SCOW.

A firm contracted with the city of New York to remove with its tugs scows loaded with street sweepings and ashes by, the street cleaning department, and dispose of their contents. The scows were owned by the department, and the contractors were charged by the day for their use. In practice, when a scow was emptied, it was returned to a dump for reloading, and delivered to the inspector in charge, and was then credited to the contractors, until the time it was again taken out. Another concern also had the privilege of sorting the refuse after loading before the scow was delivered to the contractors for removal. *Held,* that after a scow was returned to an inspector, and until it was again loaded and delivered to the contractors, they were not responsible for its handling, and that the city was alone liable for damage caused by a collision between a loaded scow which had been removed from the dump by direction of the inspector, and tied up outside of another and a schooner lying at a wharf, against which the scow drifted after breaking loose because of being insufficiently secured.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 244-247; Dec. Dig. § 115.*]

In Admiralty. Suit for collision by the Weehawken Dry Dock Company against the City of New York, with Dailey & Ivins impleaded. Decree for libelant against the city.

Peter Alexander and Allen S. Davenport, both of New York City, for Dailey & Ivins.

Archibald R. Watson, Corp. Counsel, and George P. Nicholson, Asst. Corp. Counsel, for respondent.

MAYER, District Judge. Libelant seeks to recover damages sustained by the schooner George Knapp by collision, on the evening of May 11, 1911. On that day, the schooner was lying at the bulkhead between Seventy-Ninth and Eightieth streets, East river, in the borough of Manhattan, city of New York, discharging a cargo of brick. She was headed downstream; her stern being a short distance below the southerly line of Eightieth street. The city of New York owns the bulkhead at the foot of the latter street, and on the date above mentioned owned and operated a dumping board erected on the bulkhead, by which ashes and street sweepings collected by it, through its department of street cleaning, were deposited into vessels and conveyed thence by the latter to various places for final disposition. On May 11th the scow D. S. C. No. 36, owned by the city of New York, was lying under the dumping board, receiving cargo, and some time on the same day, the scow Bat, was brought there, empty, to take her place as soon as she was loaded. During the afternoon, the loading of No. 36 was completed, and at about 5 p. m., she was hauled out, the Bat was placed under the dumping board, and No. 36 was made fast to and outside of her. No. 36 was moved under the direction of the city inspector, who was in charge at that place, the actual hauling

being performed by men employed around the dump, under an agreement made with the city. The Bat was attached to the bulkhead with her own lines, in the usual manner. No. 36, instead of running lines across the Bat to the dock, depended entirely upon the latter's lines. There is no wharf at the place in question, but simply a bulkhead running parallel with the course of the river. Eightieth street is a little below the Gate in direct line with the current, and gets the full force of the Gate tide. The ebb tide is strong, and it was not safe to leave No. 36 moored as she was. At about 10:30 p. m., during the ebb tide, under the additional strain caused by her having No. 36 loaded and attached to her, the line between the up-river end of the Bat and the mooring post on the bulkhead parted. This allowed both vessels to swing off, and as they caught the tide crosswise, it parted one line after another, until the boats were cast adrift. Under the influence of the tide, and by reason of their lines parting in the manner specified, the two scows swung completely around, and the stern of No. 36, which had been her up-river end, came into contact with the schooner George Knapp, and caused the injuries for the recovery of which this suit was brought. Both respondents admit that libelant is free from fault, and is entitled to recover the amount sued for, with interest. The Bat owed no duty to No. 36. It was the duty of the latter vessel to retain herself in her position, by running her own lines to the wharf. In so far as she depended upon the lines of the Bat, she took the risk, and must make good the damages which were caused by her own fault.

The suit was instituted against the city alone. The latter interpleaded Dailey & Ivins, who were duly brought in by petition. The city, as owner of No. 36, is primarily liable, and the real object of the litigation is to determine whether or not the city can impose its liability upon Dailey & Ivins.

The city bases its contention upon the provisions of a certain contract entered into between it and Dailey & Ivins, for the removal of street sweepings and ashes. This contract was dated in 1907, and became operative in January, 1908. Dailey & Ivins maintain that they are not liable on two grounds: (1) At the time of the accident, No. 36 was not under their control, but in the custody and under the control of the city. (2) The collision was caused by the fault of the city and not through any fault on their part, and for that reason they cannot in any event be held responsible. In the contract above referred to, there is no provision respecting the status of the department scows, from the time they are returned empty by the contractors to the various dumping boards, and delivered to the city inspectors, until they are loaded and delivered by the city to the contractors' tugs, to be towed away and discharged, except in so far as the instrument itself, speaking of its general purpose, says that it is for the removal by the contractors of vessels loaded with street sweepings and ashes from the various dumping boards, and the final disposition of their contents.

Subdivision 3 of the contract, page 12, provides that the contractors are to receive at the water front dumps of the department of street

cleaning all scows loaded with ashes, street sweepings and rubbish, and dispose of the material on said scows.

Subdivision 4, page 13, provides:

"The contractor, under this contract, is not to assort or pick over any light refuse or rubbish at the department dumps; but he shall receive and finally dispose of all such light refuse and rubbish as the person or persons, firm or corporation, having the privilege of assorting and picking over such light refuse and rubbish shall deem unsalable."

Subdivision 2, under the heading "Specifications" in the contract, provides:

"The contractor shall at all times be solely responsible for the safety of all scows and other vessels while in his charge, and shall, at his own cost and expense, keep in good condition and repair all the said scows; and all the repairs and alterations made necessary in said scows shall be made by the contractor under the supervision of the commissioner."

It will be noted that there is no definite provision as to when a scow is "in charge" of the contractors. Ordinarily the property of one is deemed to be in charge of another when the latter is able to exercise control over such property, and here it is clear that the contractors have no authority over the scows until their tugs arrive to tow the scows to the dumping grounds. Where, as here, the contract is blind upon the crucial question in the case, "there is no surer way to find out what the parties meant than to see what they have done" and the rule of practical construction, based, as it is, on good sense and experience, has usually been found of great value. Insurance Co. v. Dutcher, 95 U. S. 269, 273, 24 L. Ed. 410; Woolsey v. Funke, 121 N. Y. 87, 24 N. E. 191. Upon this theory, the testimony of Messrs. Dailey and Lancaster was adduced and admitted. Lancaster has been in the employ of the city for 19 years, in the bureau of final disposition. He was an intelligent, clear-minded witness, thoroughly familiar with all the workings of the department. His testimony was, in all respects, in accord with that of Dailey respecting the practical construction of the contract by the parties, and also their operation under it during the five years of its existence. By the testimony of these two witnesses the following facts were established: The department scows were not assigned to the contractors for any definite term, but by the day. The city charged the contractors $6 per day for each day, or any part of a day, commencing at 8 a. m. All scows which were returned empty to the department dumping boards before 8 a. m. were marked discharged on the inspector's books. By this was meant they automatically went out of the employ of the contractor and were not charged against them again, until they went back into their service. Each of these vessels was in charge of a master, who was hired by the city, paid by the city, and over whom the contractors had no control. When a scow was returned empty by the contractors to a dumping board for cargo, she was delivered into the custody of the city, acting through its inspector, and the contractors had absolutely nothing further to do with her, until she was reloaded and again turned over to their tugs for removal. During

the interim, she was in charge of the inspector, with her own master on board, to look after her; was made fast to the city's wharf under the city's dumping board; was loaded by persons over whom the contractors had no control; was shifted and made fast under the directions of the inspector; and her cargo was trimmed and sorted over by persons not in the employ of the contractors.

There are two other facts proven in the case, which strongly support the contention of the contractors. (1) The city entered into an agreement with some party or parties, whereby the latter obtained the privilege of picking over the cargoes loaded upon the scows, and, as a part of the consideration for this privilege, agreed that their employés should do the actual hauling and shifting of the scows under the direction of the city inspector. (2) If anything occurred while the scows were under the various dumping boards, which required the assistance of tugs to shift them, or, in case of their springing a leak, to pump them out, the city hired tugs for that purpose and paid the tugs for the services so rendered.

Subdivision 1 of the contract, page 17, provides as follows:

"The above-mentioned prices or sums shall be the sole compensation for the work to be performed under this contract, and no claim shall be made by the contractor for any greater or extra compensation. * * *"

If the vessels, during the period referred to, were in the custody and care of the contractors, or under the contractors' control, the city certainly would not hire these tugs and pay for them.

At the termination of the case, the question was raised whether or not it was a fault on the part of the contractors not to have removed No. 36 after her loading had been completed at 3:30 on the afternoon of the day in question. The issue was not raised by the pleadings, and the city did not regard it as a fault at the time. On the contrary, it evidently recognized No. 36 as being in its own care and custody, for it paid the bill of the tug Automatic for putting her to a dock, after she had broken adrift and injured the schooner. Further, the captain of the Bat says No. 36 was hauled out and made fast alongside of him at about 5 p. m., and her master went ashore for the night. On the evidence in the case it is fair to assume that the going ashore of the master of the scow shows it was well understood at the time that she would not be taken away until the following morning. The contractors brought the Bat empty to the dump that day, and there is nothing in the contract which required them to tow away No. 36 until one of their tugs returned to this bulkhead. There is no provision in the contract requiring the contractors to move the scows within a limited time, after they are loaded, and if there were any intention between parties to limit or restrict that time, the instrument should say so in appropriate words. The court cannot read into the contract such a provision, especially in view of the practical construction which has been placed upon the contract by the parties themselves. The city, acting through its servants and employés, placed the boat in a dangerous position, improperly secured. That was the proximate cause of the damage.

Assuming that the contractors were notified about 3:30 in the afternoon that the scow was loaded, there is nevertheless no change in the situation. No doctrine of reasonable time can be invoked in this case either from the provisions of the contract or from the practice of the parties.

We are not concerned here with any question as to the proper performance of the contract by Dailey & Ivins, but only as to their responsibility and liability for the damage done.

In view of the reasons outlined, it is unnecessary to consider the second ground upon which the contractors resist liability, but it may be remarked, in passing, that on either branch of the case, the city has failed to sustain the burden of proof cast upon it.

Libelant may have a decree for the amount of its damages, with costs, and the petition of the city will be dismissed with costs.